PEOPLE *v.* KING

OPINION OF THE COURT

1. CRIMINAL LAW—EVIDENCE—ADMISSIBILITY—STATEMENTS—WARN-ING OF RIGHTS.

A statement made by defendant at a police station was not coerced where defendant was arrested in a building which had been broken into and replied in effect that he didn't care to discuss the matter when asked his name and what he was doing there; was then read a warning of his rights from a printed card; told his name in the police car on the way to the station; was again given a warning of his rights at the station, and signed a waiver of rights; and then confessed the crime of breaking and entering with intent to commit larceny after three hours of questioning.

2. CRIMINAL LAW—EVIDENCE—ADMISSIBILITY—STATEMENTS—RIGHT OF SILENCE—WAIVER.

Defendant waived his right to remain silent where his confession was obtained after he was advised of his constitutional rights and signed a waiver of his right to remain silent.

DISSENT BY BRONSON, J.

3. CRIMINAL LAW—RIGHT OF SILENCE—ASSERTION OF RIGHT—INTER-ROGATION.

*Once a person who is in custody indicates in any manner at any time prior to or during questioning that he wishes to remain silent, his interrogation must cease.*

4. CRIMINAL LAW—RIGHT OF SILENCE—ASSERTION OF RIGHT—WAIVER —BURDEN OF PROOF.

*The prosecution has the burden of showing that a defendant, who previously invoked his right to remain silent, has voluntarily waived his right.*

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 29 Am Jur 2d, Evidence §§ 529, 545.
[2-5] 29 Am Jur 2d, Evidence §§ 555–557.

5. CRIMINAL LAW—RIGHT OF SILENCE—ASSERTION OF RIGHT—INTER-
ROGATION.

> *All interrogation of the defendant should have ceased where
> the defendant invoked his right to remain silent after his
> arrest, because repeated attempts to question the accused
> initiated by those aware of the previous exercise of the right
> to remain silent, even if preceded by new recitation of warn-
> ings of his rights, can only convey to the accused that the
> police will not take "no" for an answer.*

Appeal from Midland, James R. Rood, J. Sub-
mitted Division 3 March 31, 1971, at Grand Rapids.
(Docket No. 8820.) Decided June 21, 1971.

Irving Eugene King was convicted of breaking
and entering with intent to commit larceny. Defend-
ant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Der-
engoski,* Solicitor General and *Edward G. Durance,*
Prosecuting Attorney, for the people.

*Henry A. Rogers,* for defendant on appeal.

Before: HOLBROOK, P. J., and BRONSON and
O'HARA,* JJ.

O'HARA, J. My colleague's statement of fact is en-
tirely accurate, if somewhat truncated. I feel obli-
gated to add what he apparently considered incon-
sequential details.

On September 17, 1969 the police of Coleman,
Michigan, received a telephone call that a window
was broken in the front of the K&D Supermarket in
that city and that a man was seen walking close by
it. Officer Louis Frankovic of the city police force,

---

* Former Supreme Court Justice, sitting on the Court of Appeals
by assignment pursuant to Const 1963, art 6, § 23 as amended in
1968.

in response to the call, drove to the involved building. He observed a window broken in a door to the building. With a measure of commendable prudence he called for help from the Michigan State Police. Within two minutes a squad car and two troopers arrived. One covered the back of the building. Officer Frankovic and the other trooper entered through the broken window in the door. Inside they found the defendant crouched down near a refrigerator. Two cash registers had been rifled. Their contents consisting of bills and silver had been removed. They placed the defendant under arrest. With understandable curiosity they asked him his name, and what he was doing there. He replied in effect that he didn't care to discuss the matter. Thereupon one officer read him a printed *Miranda*[1] warning card containing the essential warnings of the right to remain silent, to have counsel, and that anything he did say could and would be used against him in court.

With this sketchy amount of probable cause to believe a crime had been committed, and that the crouchee had committed it, the officers took defendant into custody and started for the police station. They had previously observed an automobile parked close to the building and deemed it advisable to note the license number. Up to this point the defendant had not given his name. Since it was his automobile, registered in his name, he apparently decided enroute to the station to admit his identity. As an incident of what may be regarded as a lawful arrest without a warrant the police searched him and removed from his person some bills and silver and a penknife. (Later, on trial, defendant testified that

---

[1] *Miranda* v. *Arizona* (1966), 384 US 436 (86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974).

prior to his arrest he did not have a dime to make a phone call.)

At the police station he was again given the *"Miranda* warnings". After some three hours of questioning he signed a confession, admitting he broke into the building with the intention of taking property of value therefrom.

On trial it was his defense that the statement he gave at the police station was obtained in violation of his Fifth Amendment rights as defined and refined in *Miranda.* The defense was not to the point that he did not break the window and enter the store— this he freely admitted—but rather that the part of his statement relating to his intention for breaking into the store was coerced; thus rendering, I suppose, under *Miranda,* the extrinsic evidence of that intent and the permissible inferences from such evidence, nugatory. For if the confession was erroneously received, the fact of other evidence of intent is unimportant. The erroneous admission of the confession would seem to mandate a new trial with the confession excluded as a matter of law.

Pursuant to our practice, as noted by my colleague, a *"Walker* hearing"[2] as to the admissibility of the confession was held. Only the defendant testified which, of course, he may do without prejudice to electing not to take the stand in the case in chief.

At the conclusion of that hearing, the trial judge ruled the confession admissible on the basis of the defendant's own testimony on direct and on cross-examination.

The case then boils down to this: The defendant claims under his testimony that his confession was involuntary because it was the result of questioning

---

[2] *People* v. *Walker* (On Rehearing, 1965), 374 Mich 331.

proscribed by *Miranda, supra.* The state claims, by its witnesses, the confession was obtained after a waiver of the right to remain silent was signed. As I read *Miranda,* it prohibits the admission of neither volunteered information nor that given pursuant to an understanding and intelligent waiver. As to waiver, the court examined the defendant as follows:

*"The Court:* Well, Mr. King, you say you were given this statement, the one you signed here, and you say that you read it over, is that correct?

*"The Defendant:* Yes, your Honor.

*"The Court:* And you were asked if you understood it, and you said that you did?

*"The Defendant:* Yes, your Honor.

*"The Court:* Well, it says here, that you understood you have a right to consult an attorney. You understood that, did you?

*"The Defendant:* Yes.

*"The Court:* And, to have your attorney present at this time or at any other time hereafter. You understood that, did you?

*"The Defendant:* Yes.

*"The Court:* That, if you couldn't afford to have an attorney, one would be appointed for you, and be paid for by the county. You read that part of it, didn't you?

*"The Defendant:* Yes, your Honor.

*"The Court:* Well, what is it you are complaining about? This is what I don't quite understand. What rights were violated? You are saying to me that your rights were violated. What do you mean by that? What rights were violated?

*"Mr. Groom* [*defendant's attorney*]: Your Honor, I think, perhaps, Mr. King's point of view can best be answered by a question from me. Irving, was it your intention, at any time, in your conversations with Detective Whipple, Trooper Lick, or anybody else, to confess to the crime with which you are charged?

"*The Defendant:* No.

"*Mr. Durance* [*prosecuting attorney*]: I don't know how the answer to that question can help; it is a conclusion on his intent and not what occurred or what he actually did."

I am not at all sure that I completely understand the legal premise that because the defendant did not "intend" to plead guilty to the crime charged how that intention changes what in fact took place.

On the total issue of credibility in the case, the defendant chose to take the stand. In so doing, he placed his credibility in issue. We quote the cross-examination on this issue as it bears on his declared lack of specific intent.

### *Credibility* (Cross-examination):

[*By Mr. Durance*]:
"*Q*. Okay, Mr. King, let's get acquainted here. Have you ever been arrested and convicted of any crime?

"*A*. Yes, I have.

"*Q*. When and where was that?

"*A*. 1964 in Virginia.

"*Q*. Would you tell us the exact name of that crime?

"*A*. Burglary.

"*Q*. That is what they call breaking and entering, isn't it?

"*A*. Yes.

"*Q*. And, that was in 1964 in West Virginia.

"*A*. Yes.

"*Q*. But, you said Virginia, before, which is it?

"*A*. West Virginia; I misspoke myself.

"*Q*. Any other offenses?

"*A*. 1962, in the U. S. Army.

"*Q*. What was the offense charged then?

"*A*. Larceny.

*"Q.* Anything else?

*"A.* There was one other one in 1960 or 1961; it was black marketeering."

### *Specific Intent* (Cross-examination):

*"Q.* And, you are able to form the intent to say I don't want to answer your questions. You made that decision, didn't you?

*"A.* Yes.

*"Q.* \* \* \* Why did you break the window?

*"A.* I don't know.

\* \* \*

*"Q.* \* \* \* Now, once you were inside the building, what did you do?

*"A.* I walked up the one aisle and started down the other one.

*"Q.* When did you take the money out of the cash register?

*"A.* When I walked by the cash register, I seen the change.

*"Q.* How many stones did you throw through the window?

*"A.* Two.

\* \* \*

*"Q.* How long were you in the building before the officers arrived?

*"A.* Approximately two minutes.

\* \* \*

*"Q.* And, your counsel brought out that you had passed a bad check that night at the bar?

*"A.* Yes."

Perhaps it is possible to throw two stones through a window, break it, enter through the break and within two minutes take money out of a cash register while too intoxicated to form a specific intent. It would seem that irrespective of the defendant's protestations to the contrary, there is at least an issue of fact.

In my view, defendant was the victim of no trickery, coercion, maltreatment, long detention, or anything else prohibited by the Federal Constitution or the Constitution of this state.  He broke into a building, took money, was arrested two minutes after he broke in with the money he took on his person while he was still in the building.  He signed a statement acknowledging all of his *Miranda* rights were made known to him before he signed it.

It is now contended that because when apprehended in the commission of the offense he indicated he did not care to talk about it, the police could not thereafter ask him anything further.

We cannot but agree with the trial judge: "I do not believe that that is what the *Miranda* decision says.  It hasn't gone that far yet."

I would affirm the conviction.

Holbrook, P. J., concurred.

Bronson, J. (*dissenting*).  Defendant, Irving King, was convicted by a jury of breaking and entering with intent to commit larceny.  MCLA § 750.110 (Stat Ann 1971 Cum Supp § 28.305).  He appeals as of right.

Defendant was arrested at 2 a.m. on September 17, 1969 inside a supermarket in Coleman, Michigan.  The police officer who made the arrest advised defendant at that time of his constitutional rights pursuant to the requirements of *Miranda* v. *Arizona* (1966), 384 US 436 (86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974).  Defendant indicated he wished to remain silent.  Forty-five minutes later he was put into a police car, advised of his rights again, and on the way to the police station told the arresting officer his name and a few of the details of the crime.  Upon arrival at the police station, defendant was

further interrogated by the arresting officer, where-
upon defendant signed a waiver of his *"Miranda
rights"* and confessed to the crime by supplying
statements of his specific intent to commit larceny.
Defendant was allowed to go to his cell at 6:30 a.m.

Before trial, defense counsel moved to suppress
the confession, alleging that it was the product of
police coercion.  At the *"Walker* hearing"[1] held to
determine the issue of the voluntariness of the con-
fession, only the defendant testified.  Since it was
upon the basis of defendant's testimony that the
trial judge denied the motion to suppress, I quote
extensively from the record:

(*Direct*):
"*Q.* Now, you have indicated you were arrested
around two o'clock in the morning?
"*A.* Around that time, yes.
"*Q.* What happened when you were arrested?
"*A.* He told me I was charged with a B & E; that
I had the right to remain silent; that anything I did
say would be held against me; and then, he asked
me if I had anything to say.
"*Q.* And, what did you reply?
"*A. I told him I had nothing to say, at that time.*
"*Q.* Then, what happened after that, do you
recall?
"*A.* After sometime, I was put into the police car;
and, they started to proceed to the Midland County
Jail.

\*     \*     \*

(*Cross*):
"*Q.* You were further advised similarly of these
rights after you were in the patrol car headed for
Midland, were you not?

---

[1] *People* v. *Walker* (On Rehearing, 1965), 374 Mich 331, requires
a hearing out of the presence of the jury before any confession is
determined voluntary.  See, also, *Sims* v. *Georgia* (1967), 385 US
538 (87 S Ct 639, 17 L Ed 2d 593); *Jackson* v. *Denno* (1964), 378
US 368 (84 S Ct 1774, 12 L Ed 2d 908, 1 ALR3d 1205).

"*A.* I believe it; I believe I was, yes.

"*Q.* And, in the patrol car  *  *  *  you told the officers something about the matter. What did you tell them about the matter on the way to Midland, before you got to jail?

"*A.* I told him my name, which I hadn't given him before; because he radioed ahead to the Mount Pleasant Post to check on my registration. I told him I might as well tell him my name because he was going to find it out anyway. I do remember this; but, I don't remember the questions I answered. I think I did answer a couple of more.

"*Q.* Did you tell them, at that time, about picking up a stone or breaking the window?

"*A.* I might have; I don't remember that.

*  *  *

(*Direct*):

"*Q.* Now,  *  *  *  after you had arrived here in Midland  *  *  *  you did talk to the officers. Now, why, after you had indicated previously you didn't want to say anything, did you agree to talk to the officers?

"*A.* Well, after I was brought into the county jail, and they took my personal property, and they were making out a form, I put my cigarettes in my pocket; and, Trooper Lick asked where there was an office he could use; and, he said he wanted to talk to me before I was put in a cell. And, the jailer or the turnkey told him he could use one of the offices down the hall; and, he said, 'King, I want to talk to you before you go anywhere. We got paper work to fix up.'

*  *  *

"*Q.* What did he say to you after he got inside the room and you were in there with him?

"*A.* He advised me of my rights again; and, showed me the printed form.

*  *  *

"*A.* He told me to read it; and, if there was any questions, I was to ask them; and, I read it and I

said, no, first he said, 'Do you understand it?' And, I said, 'Yes, I guess so.' And, he says, 'Okay, now, we are going to ask you some questions and we would like to get a statement.' He said; because, as I understood it, this is what they had to have before I would be put in a cell. He said that that was proper procedure; I mean, that they had to have this statement; so, we went over the things, the same things that I had been discussing. *I—at first, I didn't want to answer any questions; but, after a while, I started answering because I didn't see what difference it made; I just wanted to get to bed.*" (Emphasis supplied.)

This Court has interpreted the *Miranda* decision to mean that, although the accused need not be specifically advised that interrogation will cease at his request, once the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. *People* v. *Tubbs* (1970), 22 Mich App 549. As stated by the Court in *Miranda* (p 474):

"At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise."

Such an interpretation does not necessarily bar the use of statements *volunteered* by a defendant who previously invoked the privilege against self-incrimination. Nevertheless, the prosecution has a heavy burden of showing that a defendant, who previously invoked the right to remain silent, has voluntarily decided to waive his Fifth Amendment right. *Miranda* v. *Arizona, supra,* at p 478; *People* v. *Hill* (1968), 39 Ill 2d 125 (233 NE2d 367); *cf. Tucker* v. *United States* (CA 8, 1967), 375 F2d 363.

However, it is clear from a careful reading of the record in the instant case that all interrogation of defendant should have ceased when he was arrested and first invoked his Fifth Amendment rights. Repeated attempts to question the accused initiated by those aware of the previous exercise of the right to remain silent, even if preceded by new recitation of the *Miranda* warnings, can only convey to the accused the impression that the police will not take "no" for an answer. The trial judge denied the motion to suppress on the ground that defendant did not repeat his desire to remain silent in the face of police interrogation in the police car or at the jail, instead of upon the basis of whether defendant himself initiated conversation and volunteered the statements. Since the defendant's statements to the police established his specific intent to commit larceny, whereas defendant's theory of innocence at trial was that he was unable to form the requisite specific intent due to a state of intoxication, I cannot say that the admission of the confession, if involuntary, was harmless error.

I am constrained to vote for reversing the conviction and remanding this case for new trial.