(No. 40605.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* CLARENCE HILL, Appellant.

*Opinion filed January 19, 1968.*

WARD, J., took no part.

EDMUND W. KITCH, of Chicago, appointed by the court, for appellant.

WILLIAM G. CLARK, Attorney General, of Springfield, and JOHN J. STAMOS, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and ELMER C. KISSANE, DANIEL W. WEIL, and OLIVER D. FERGUSON, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

Clarence Hill was found guilty of murder by a jury in the Cook County circuit court and sentenced to imprisonment for a term of 15 to 30 years. On this direct appeal he alleges that the admission into evidence of an incriminating statement which he made while in police custody violated his constitutional rights to assistance of counsel and against self-incrimination under the doctrine of *Miranda* v. *Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. He asserts as a second ground for reversal that one of the instructions given to the jury on criminal accountability was an erroneous statement of the law.

At approximately 11:15 P.M. on July 3, 1966, Officer Love Davis, a "gang officer" of the Chicago Police Department, found Charles Linear, the victim of a shooting, dead in Garfield Park. At 3:00 on the morning of July 4, Officer Davis arrested the defendant because he believed Hill to be a member of a gang in the area known as the "Casanova Cobras." From his home where the arrest was effected, the defendant was taken to the Maxwell Street Station for questioning.

The chronology of events on the night of July 3 leading up to the murder was supplied at the trial by the testimony

of the State's witnesses. Curtis Dotson, a 16-year-old boy, testified that he was a member of a gang called the "Roman Saints", and that on the night in question he and 15 or 20 other youths gathered on the street corner of Albany and Jackson at about 10:00 P.M. According to Dotson's testimony all of the members of the group besides himself and one other were members of the Casanova Cobras and they were armed with one pistol and one rifle which he knew about. From the time that the youths joined forces at Albany and Jackson until the fatal shooting on the edge of Garfield Park none of the boys left the group. When the gang arrived at Garfield Park they saw some young men sitting on a bench drinking beer, and as they approached the men seated on the bench Dotson heard the cry of "Spanish Cobras" followed by gun shots which were fired from the group.

Dotson's testimony was corroborated by two other witnesses for the prosecution: James Johnson an employee of the YMCA who worked with gangs in the vicinity, and Clifford Faulkner who was with Charles Linear at the time he was murdered. Faulkner, who was wounded in the incident, stated that he saw a gang of fellows approaching and heard them call out "Mighty Cobras" and said he was shot as he dove to the ground in an attempt to flee. James Johnson testified that he was standing on the street two blocks from Garfield Park when he heard shots at approximately 10:30 P.M. As he proceeded in the direction of the shooting Johnson was attacked by a band of approximately 10 or 15 youths all screaming "Cobras and Roman Saints". In the melee Johnson sustained a stab wound that required 10 stitches to treat. None of the State's witnesses was able to identify Clarence Hill as a gang member who was present when Charles Linear was murdered.

When the defendant arrived at the Maxwell Street Station between 3:00 and 3:30 A.M. he was questioned by Detective John Serafini who was conducting an investiga-

tion into the slaying. Prior to their conversation the police officer testified that he warned Hill of his constitutional rights as required by the rule of *Miranda* v. *Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. Serafini stated that Hill responded to his questions regarding the murder by saying, "I don't know anything about the shooting. I don't know anything." The detective testified that between the time the youth was brought to the station and 6:00 o'clock that morning, he questioned Hill on three or four separate occasions for periods of 10 to 15 minutes each. During these periods of interrogation the detective was alone with the defendant in an interview room and inquired as to Hill's involvement as well as that of others whose names had come up in the investigation. While the defendant does not dispute the adequacy of the *Miranda* warnings initially given by Detective Serafini, it is clear that the police officer did not renew the warnings each time he returned to the interview room to resume questioning Hill. Detective Serafini testified that during his second conversation with the defendant, Hill stated that he was with a girl at the time of the shooting. At the trial the defendant admitted that he had given such an account of his whereabouts to the police officer because he was scared, but that he was really at a hamburger grill when the murder occurred. Although Hill named two persons in the restaurant with whom he testified he was carrying on a conversation at the time the murder was taking place, neither of the named persons was called to testify.

The major question raised in this appeal relates to an incriminating admission which Detective Serafini testified was made by the defendant at about 6:00 A.M. after the officer had finished questioning Hill and other police had been called to transport defendant from the Maxwell Street Station to the police lockup at 11th and State streets. The detective's testimony follows: "I had called for a squadrol to transport Mr. Hill back to the 11th District, and as Mr.

Hill saw the patrolmen come up the stairs he called to me, and when I went back into the room he told me, he says 'Serafini, look, I was there, but I didn't do the shooting.' He said, 'The stud that was standing next to me did the shooting.' * * * He said, 'I told him to only wop him on the head a few times.' * * * He identified the man with the gun as Willie Clemons."

Both the State and the defense cite the *Miranda* decision as authority for holding that the trial court's action in admitting this incriminating statement was either correct or improper. Counsel for the defendant relies heavily on the warning of *Miranda* that "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. * * * But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." 384 U.S. at 475-76, 16 L. Ed. 2d at 724, 86 S. Ct. 1602.

By asserting that the defendant's admission was a "volunteered statement", the prosecution attempts to avoid the burden of showing that his incriminating words were spoken voluntarily after a knowing waiver of constitutional rights. The State contends that the defendant's statement to Detective Serafini comes within an exception for volunteered statements which the *Miranda* majority would allow into evidence even when not preceded by the four warnings now required as a prerequisite for the admission of statements elicited during in-custody interrogation. In the following passage *Miranda* apparently sets forth a distinction between "volunteered statements" that are not the product of police questioning, and those confessions which are voluntarily given in response to interrogation by law enforcement officials:

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." (384 U.S. at 478, 16 L. Ed. 2d 726.) In support of its contention that the defendant's damaging admission was the type of volunteered statement which is left unaffected by *Miranda,* the State notes that the conditions under which it was given include (1) that the statement was made after all the questioning had ceased; (2) that the defendant knew all questioning had terminated; (3) that the defendant was in the process of being taken out of the police station; (4) that the defendant had to call the officer back into the room in order to give him the statement; (5) that the defendant was not subjected to interrogation after he made the statement; (6) that the trial judge found that the statement was made "after" a series of interrogations.

While the State's argument that the defendant's statement falls within the confines of the niche carved out in *Miranda* for volunteered statements is not without merit, and although future clarifications of the "volunteered statement" exception may show that Hill's in-custody admission comes appropriately within that category, we prefer to predicate our affirmance on a different basis. Under the circumstances here it is possible to equate Hill's inculpatory

admission with the incriminating statement of a person who enters or calls a police station to confess a crime, or analogize it to a suspect's spontaneous statement to police before any questions have been propounded to him. (See *In re Orr*, 38 Ill.2d 418 and cases cited therein.) However, we do not believe that defendant's statement was wholly unresponsive or unrelated to the questions put by Detective Serafini concerning the events surrounding the murder. Hill's statement was an effort to avoid further incarceration by placing the blame on the person who was, in defendant's estimation, the real culprit, and this attempt may most realistically be classed as a delayed response to the prior questioning.

Since we prefer not to rest our decision on the volunteered statement exception, we turn to the question of whether the defendant's statement was a voluntary response to the police officer's inquiries or an involuntary by-product of a coercive atmosphere. Although the safeguards of *Miranda* were designed to assure that incriminating statements elicited during custodial interrogation be proved voluntary as a *sine qua non* of admission into evidence, this objective does not in our opinion diminish the importance of such questioning as "undoubtedly an essential tool in effective law enforcement" (*Haynes* v. *Washington*, 373 U.S. 503, 515, 10 L. Ed. 2d 513, 83 S. Ct. 1336) and as an aid in securing the police station confession which is "itself desirable so far as truly voluntary." (*Collins* v. *Beto*, (5th cir.) 348 F.2d 823, 837, (Friendly, J., concurring).) In cases such as this, where it is undisputed on appeal that the *Miranda* warnings have been adequately given at the inception of the questioning, we must make an *ad hoc* determination of the specific facts bearing on voluntariness since no *per se* rule has yet been adopted to govern this problem. *Narro* v. *United States*, (5th cir.) 370 F.2d 329; *Brisbon* v. *State*, (Fla. App.) 201 So.2d 832, 834.

It should be made clear that once *Miranda's* mandate

was complied with at the threshold of the questioning it was not necessary to repeat the warnings at the beginning of each successive interview. To adopt an automatic second-warning system would be to add a perfunctory ritual to police procedures rather than providing the meaningful set of procedural safeguards envisioned by *Miranda*. *Gorman v. United States*, (1st cir.) 380 F.2d 158, 164.

A factor of importance here is the relatively short period of time during which the defendant was subjected to questioning while in police custody—at most a total of 60 minutes apportioned over a 3-hour period. The record here is free from any hint of physical coercion, or any design to use *incommunicado* interrogation to subjugate the individual to the will of the interrogator. (Compare *Miranda v. Arizona*, 384 U.S. 436, 445-58, 16 L. Ed. 2d 694, 707-714, 86 S. Ct. 1602.) Clarence Hill by his own judicial admission was no stranger to police investigations, and the defense makes no attempt to show that he suffered any infirmity which would render him especially susceptible to subtle psychological techniques. (Compare *Miranda v. Arizona*, 384 U.S. 436, 457, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) In view of the defendant's prior experience with police and the failure to present any evidence of substandard intelligence, we hold that the admissibility of Hill's statement was not affected by the fact that he was 17 years of age at the time he was questioned. (See *People v. Connolly*, 33 Ill.2d 128, *cert.* den. 384 U.S. 1023, 16 L. Ed. 2d 1027, 86 S. Ct. 1959; *People v. Lara*, 62 Cal. Rptr. 586, 597-605, and cases cited therein.) The factors present here, of interrogations for relatively short periods of time, unaccompanied by any semblance of coercion, have been deemed sufficient to support a finding of the voluntariness of a confession made to law enforcement authorities where the *Miranda* rights have been clearly explained. (*Alexander v. United States*, (8th cir.) 380 F.2d 33.) We also find it significant that despite Hill's original disavowal of

any involvement in the murder, he in no way indicated to Detective Serafini "any disinclination to submit to further questioning" (*Tucker* v. *United States*, (8th cir.) 375 F.2d 363, 369), and the circumstances of a defendant's freely answering certain questions posed by police has been held sufficient to rebut the normal presumption against waiver of constitutional rights. (*Government of Virgin Islands* v. *Lovell*, (3d cir.) 378 F.2d 799, 803-04.) On the state of the record before us, considering the fact that the adequacy of the *Miranda* warnings is not disputed here, that the questioning was not for an inordinate period of time, that the period of interrogation had concluded as far as the police were concerned before the statement was made, that the defendant never sought to terminate the questioning, and that Hill's admission was a self protective attempt to shift the blame onto another and thereby relieve himself of all fault, we hold that the State has sustained its burden of showing a knowing waiver of the defendant's constitutional rights.

The defendant's second asserted ground of reversible error is that the following jury instruction (Instruction No. 13) incorrectly stated the legal standard by which Clarence Hill's criminal accountability was to be determined: "The court instructs the jury that if there is evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design, there is an inference that he shared a common purpose and this will sustain his conviction as a principal for a crime committed by another in furtherance of the venture." This instruction represents a direct quotation from our discussion of accessoryship principles in *People* v. *Rybka*, 16 Ill.2d 394, 405, where we affirmed the murder conviction of a gang member whose participation in that crime bore striking similarities to the actions of the defendant here. While the defendant admits that the above instruction was given in conjunction with another jury instruction (Instruction No. 12) that cor-

rectly set forth the rules of vicarious criminal liability by incorporating the language of the accessory statute (Ill. Rev. Stat. 1965, chap. 38, par. 5—2), he contends that it was improper to use our language from *Rybka* as a jury instruction on the issue of criminal accountability because we were there enunciating a standard which would "sustain" a criminal conviction on appeal rather than setting forth a permissible basis which could guide a jury in arriving at its verdict. The defense asserts that Instruction No. 13 is a compilation of ambiguous phrases that allows the State to avoid its burden of proving that the defendant solicited, aided or abetted another in the commission of murder.

We do not agree with the defendant's fundamental proposition that Instruction No. 13 is an erroneous statement of the law of criminal accountability for jury instruction purposes. The *Rybka* case from which this instruction was taken involved a plan by a gang of boys to "get" or "roll" a Negro that they might find in their all-white neighborhood. As the youths patrolled the vicinity in a car they were aware that one member of the group named Schwartz was carrying a hammer with the probable design of using it once their victim was found. Defendant Rybka was riding in the car and he, like Clarence Hill, told his companion carrying the lethal weapon that they should use their fists and not the hammer. Despite Rybka's urging that his comrade exercise restraint, his murder conviction arising as a result of Schwartz's hammer-wielding attack upon the gang's Negro victim was sustained on accountability principles. In *Rybka* as in the present case the facts that the companions accompanied the armed assailant to the place of the attack, were present during the commission of the crime, and fled the scene with the attacker thereafter, gave "rise to a justifiable inference that the assault * * * was pursuant to a common purpose." (*People* v. *Thicksten,* 14 Ill.2d 132.)

(16 Ill.2d at 405.) The inference referred to in Instruction No. 13, like the one just quoted is a soundly established part of the decisional law of this State (see *People* v. *Tarver,* 381 Ill. 411; *People* v. *Rudecki,* 309 Ill. 125) which is wholly consistent with the statutory sections relating to criminal accountability, and it is entirely proper for a trial judge to explain that such inferences may be drawn from the factual situations in appropriate cases.

When Clarence Hill became a member of an armed gang of young desperadoes who were intent on pursuing violent deeds, in the contemplation of the law he risked sharing the same criminal responsibility as the member who carried the gun. It is no defense that the criminal acts were not committed pursuant to a preconceived plan since the defendant's own admission indicates his involvement in the spontaneous acts of the group (*People* v. *Richardson,* 32 Ill.2d 472, 477), and it is immaterial in this regard whether Hill meant "wop" as a suggestion to hit or shoot the deceased. Where proof in a criminal case "shows that a person is present at the commission of a crime without disapproving or opposing it, it is competent for the jury to consider this conduct in connection with other circumstances and thereby reach the conclusion that he asssented to the commission of the crime, lent to it his countenance and approval and was thereby aiding and abetting the same." *People* v. *Kolep,* 29 Ill.2d 116, 120; *People* v. *Smith,* 391 Ill. 172.

The inference, which Instruction No. 13 stated would exist if the jury found that Hill attached himself to the gang with knowledge of its illegal designs, was that he shared a common purpose that would sustain his conviction for the acts of another. "Sustain his conviction" used in this context would reasonably be understood by the jury as meaning "allow" or "support" his conviction, and the explanation of this permissible inference in conjunction with the main instruction explaining criminal accountability did

not result in any prejudice to the defendant's case. See *People* v. *Fedora,* 393 Ill. 165, 181-82; *People* v. *Lenhardt,* 340 Ill. 538, 551; *People* v. *Shader,* 326 Ill. 145.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.