(No. 41640.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. THOMAS CRAVEN, Appellant.

*Opinion filed June 4, 1973.*

SCHAEFER and GOLDENHERSH, JJ., dissenting in part.

JAMES J. DOHERTY, Public Defender, of Chicago (MICHAEL WEININGER, Assistant Public Defender, of counsel), for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and BERNARD CAREY, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and KENNETH L. GILLIS, Assistant State's Attorney, of counsel), for the People.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

Defendant Thomas Craven was convicted of murder by a Cook County jury and sentenced to a term of imprisonment of 50-100 years following an earlier trial in which the jury was unable to agree. He urges on this direct appeal that: (1) the trial court erred in certain of its instructions to the jury; (2) a defense witness was improperly prevented from testifying; (3) he was denied a fair trial by the prosecutor's use of a prior conviction; (4) the prosecutor was permitted to make prejudicial and inflammatory remarks during cross-examination and closing argument; and (5) he was not proved guilty beyond a reasonable doubt.

At approximately 2:30 P.M. on August 17, 1967, an unruly patron caused a disturbance in Wolfie's Snack Shop, located at 8 South Morgan Street in Chicago. The proprietor, Roy Wolfman, forcibly ejected the man from the restaurant; present at the time were three snack-shop employees: James Satiri, James Dougherty and William Blomski, together with Allison Marr, who was servicing a cigarette vending machine on the premises. Satiri, Dougherty and Marr testified at trial as to what next occurred, but their recollections differed in several respects.

Satiri, a cook, testified that once outside, the boister-

ous customer, identified only as Renecker, began pounding on one of the snack shop's plate glass windows with a large screwdriver; Wolfman became disturbed, secured a plated revolver and went outside, ordering Renecker to leave. A struggle occurred and Satiri observed Wolfman hit Renecker on the shoulder with the revolver. Satiri could not be certain how many blows were struck with the gun. After several moments, defendant and Tony Lopez came running from the direction of Madison Street and joined the struggle, pinioning Wolfman's arms behind him. Satiri was casually acquainted with these two men as "Arkie" and "Lopez." Defendant was carrying a black automatic pistol in his hand, and Satiri stated that he saw him step between two cars and attempt to cock the weapon during the fight. The struggle continued until Satiri heard one shot fired and Wolfman fell to the ground. He did not see who fired the shot. Craven and Lopez approached the body and then ran north toward Madison Street. Satiri identified the defendant as one of the two men who intervened in the altercation that afternoon, and he indicated that People's Exhibit 1 resembled the black automatic pistol that defendant had carried.

Dougherty testified that he was employed as a dishwasher at "Wolfie's" on the date of the occurrence and witnessed the disturbance which resulted in Wolfman removing a patron, a bill peddler, from the snack shop. Dougherty's view of the events was intermittent since he was carrying dishes back and forth to the kitchen at the time. He next observed his employer scuffling outside with the patron; it "got a little rough" and Dougherty could see that the bill peddler had a screwdriver and Wolfman had his silver-colored gun out. Dougherty continued with his duties and his attention was next directed to the struggle when he heard someone shout "Wolfie is in trouble" and then the sound of a gunshot. As he looked outside, Dougherty saw Wolfman grappling with the two other men, one of whom held a black gun in the air, which

Dougherty thought had been fired. Dougherty also identified People's Exhibit 1 as resembling the black gun he saw, and he believed that defendant was the man who held it. Dougherty testified that he looked for a meat cleaver so that he could assist Wolfman. As he did so, he heard a second shot and looked out to see Wolfman's body lying on the sidewalk. He did not see the shot fired. He then followed defendant from the scene for a short distance to a hotel on Madison Street.

Marr testified that he was in Wolfie's Snack Shop on the date in question and was repairing a cigarette vending machine. He stated that he observed a scuffle in the restaurant, during which one of the cooks, apparently Blomski, ejected a patron for creating a disturbance. The patron left and then returned to the walk in front of the shop carrying a screwdriver and accompanied by two men. The patron began beating on the snack-shop window with the screwdriver. Wolfman, with whom Marr was acquainted, left his place behind the counter and went to the rear, returning with a shiny, plated revolver in his right hand. Wolfman went outside, waving his revolver at the three men; the two newcomers then began fighting with Wolfman, while the ejected patron with the screwdriver "disappeared." After the fight began, the shorter of the two men produced a small black pistol similar to People's Exhibit 1 and discharged it once into the ground. The men continued to strike Wolfman and he struck them back; the larger of the two men, whom Marr positively identified as defendant, threw Wolfman to the ground, causing him to drop the revolver. Defendant then picked up Wolfman's revolver and, at a distance of approximately three feet, aimed the weapon at Wolfman's head and fired a single shot. Both men then ran toward Madison Street, defendant carrying the shiny, plated revolver. On cross-examination Marr, who was then serving in the armed forces, testified that he had not come forward to the police at the time of these events nor had he testified at defendant's first trial.

Other evidence for the State established that defendant was arrested at the Adams Hotel on West Madison Street within one hour of the occurrence. A .32-caliber Beretta automatic pistol, People's Exhibit 1, was recovered from the room of an acquaintance of defendant, Robin Young, who told police that he had taken it from defendant when he entered the hotel. Defendant's arm was bleeding from a cut above the right elbow at the time of his arrest. The proof established that Roy Wolfman died of a gunshot wound to the head, the bullet piercing the neck and chest. A .38-caliber bullet was removed from his body and that bullet could not have been fired from the black automatic pistol admitted in evidence. The shiny, plated .38-caliber revolver owned by Wolfman was never recovered.

Defendant, testifying in his own behalf, stated that he, Patricia Bittner and a man he knew only as "Tony" were standing on the southwest corner of Madison and Morgan Streets at the time of this occurrence. They observed a man, whom defendant knew to be employed in Wolfie's Snack Shop, pistol-whipping another man on the sidewalk about thirty feet away. Defendant asked Lopez for the gun which he knew Lopez was carrying so that the latter couldn't harm anyone, and defendant tucked the gun into his own belt. They then approached Wolfman and defendant ordered him to stop, grabbing him by the left coat sleeve. Wolfman struck him with the plated gun he had in his right hand, and defendant either stumbled or was pushed, falling to the pavement. He testified that he was bleeding from a cut on his arm, and Lopez's pistol had fallen out of his belt. As he lay on the sidewalk, defendant heard a shot and someone said: "Arkie, [defendant's nickname] you'd better get out of here." Defendant testified that he was frightened; he grabbed the black automatic pistol from where it had fallen and either walked rapidly or ran from the scene toward Madison Street. He turned west on Madison and as he drew abreast

of the Adams Hotel, an acquaintance of his, Robin Young, called to him from a room in the hotel. Defendant entered the hotel and went to Young's room where Young examined his bleeding arm. In response to Young's question, defendant told him that he "may have been shot," but Young replied that it was only a cut and he wrapped defendant's arm in a wet towel. Defendant testified that he then attempted to eject the shells from Lopez's pistol, but succeeded only in firing a shot through the ceiling. Young took the gun from him and left the room with it. Defendant and Young were arrested shortly thereafter. Defendant denied that he shot and killed Roy Wolfman. On cross-examination, the State questioned defendant concerning his conviction of robbery in the State of Washington in 1952, and, in rebuttal, introduced a purported copy of that judgment.

Defendant also attempted to offer the testimony of Rosemary Dawson, who would have related details of a meeting with Tony Lopez the evening after the shooting. The offer of proof made by defense counsel included an alleged confession of the shooting by Lopez to her and the fact that she saw Wolfman's plated revolver in Lopez's possession that night. Because Mrs. Dawson, with whom defendant was living, had been present in the courtroom during a portion of the previous testimony in violation of an order excluding witnesses, she was barred, on the State's motion, from testifying.

The defendant first argued that he was denied a fair trial when his tendered instructions on voluntary man-slaughter were refused. The Criminal Code provides in pertinent part:

> "(a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> (1) The individual killed,
>
> * * *
>
> Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." Ill. Rev. Stat. 1965, ch. 38, par. 9—2.

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." Ill. Rev. Stat. 1965, ch. 38, par. 7—1.

Instructions substantially comporting with the cited statutory language were among those submitted and refused. The State contends that no evidence in the instant case could support a conviction of voluntary manslaughter and cites a number of authorities including *People v. Handley (1972), 51 Ill.2d 229.* We said in *Handley* (at p. 235) that "[i]t is well settled that if there is evidence in the record which, if believed by a jury, would reduce the crime to manslaughter, a manslaughter instruction tendered by the defendant must be given. [Citations.] It is equally well settled, however, that such an instruction should not be given if the evidence clearly demonstrates that the crime was murder, and there is no evidence to support a conviction of manslaughter. [Citations.]" Such a rule, which properly guards against an invitation to compromise verdicts by the submission of unwarranted instructions, is here erroneously invoked by the State. Testimony by the State's own witnesses, if credited by the jury, could have led to a conclusion of mutual combat between defendant and the deceased. Moreover, evidence that defendant intervened in what he unreasonably believed to be the imminent use of unlawful force is to be found in some of the testimony. Of course, had the jury concluded that such

a belief was reasonable, the defendant's alleged use of force would have been justified under section 7—1 of the Criminal Code. Because these alternatives find some support in the record, we must reverse this conviction and remand the case for a new trial. *People v. Canada (1962), 26 Ill. 2d 491; People v. Papas (1942), 381 Ill. 90.*

Consideration must also be given, however, to certain of defendant's other allegations of error, since they may arise upon a retrial. Complaint is made of a flight instruction given by the court over defendant's general objection:

> "The Court instructs the jury that if the jury believes from the evidence, beyond all reasonable doubt, that a crime was committed, and if you also believe, beyond all reasonable doubt, that the defendant, immediately after the commission of the crime with which he stands charged, fled and remained away until taken into custody, such flight is a proper circumstance to be considered in determining the guilt or innocence of the defendant."

While we note that the Illinois Judicial Conference Committee on Pattern Jury Instructions in Criminal Cases has recommended that no instruction on flight be given (I.P.I.—Criminal No. 3.03), the use of substantially identical instructions has been sanctioned by this court. (*People v. Burris (1971), 49 Ill. 2d 98, 107.*) In this case, the jury could weigh against the circumstance of flight, if believed, the explanation of defendant that he was frightened and injured during the events and that he left the scene for those reasons.

Although remandment for a new trial obviates discussion of whether Rosemary Dawson was properly excluded from testifying, there remains the problem of a third-party confession, described by counsel in his offer of proof, to which she might testify in a new trial. On this point, defendant cited *People v. Lettrich (1952), 413 Ill. 172, 178,* in support of admission of the alleged confession made by Lopez to her:

"The general rule, supported by the great weight of authority, is that extrajudicial declarations of a third party, not made under oath, that he committed the crime, are purely hearsay, and even though they are declarations against interest, are inadmissible. The practicality of this rule is obvious. General admission of such statements could seriously handicap the administration of justice in tempting everyone accused of crime to introduce perjured testimony that a third party, then deceased or beyond the jurisdiction of the court, had declared that he, and not the accused, had committed the crime. The rule is sound and should not be departed from except in cases where it is obvious that justice demands a departure. But it would be absurd, and shocking to all sense of justice, to indiscriminately apply such a rule to prevent one accused of a crime from showing that another person was the real culprit merely because that other person was deceased, insane or outside the jurisdiction of the court."

In *Lettrich* the sole evidence of guilt in a murder prosecution was a repudiated confession, allegedly obtained by physical duress, and demonstrably contrary to a number of the known facts of the occurrence. The alleged third-party confession to the crime had been made to the director of the Cook County behavior clinic, apparently a completely disinterested party to the proceedings, and there could be no suspicion that the testimony was induced by the accused. (413 Ill. 172, 179.) We find that the facts of this case fall far short of the very compelling circumstances of *Lettrich*, and the recent decision in *Chambers v. Mississippi* is likewise of no aid to defendant. (410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038.) In *Chambers,* the United States Supreme Court reversed the

conviction of a Mississippi defendant who had been prevented from cross-examining the maker of a repudiated, written confession to the crime with which defendant stood charged. Chambers had also been barred from presenting the testimony of three witnesses to three separate oral confessions allegedly made by the same third party on different occasions. The court rejected a technical application of the "voucher" rule, by which Chambers was denied the opportunity to discredit through cross-examination the repudiation of a prior written confession because Chambers had called the witness as his own. Pertinent here is the court's reliance upon objective indicia of trustworthiness regarding the proffered hearsay testimony of the three defense witnesses:

> "The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability. First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case—McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22-caliber revolver and subsequent purchase of a new weapon. The sheer number of independent confessions provided additional corroboration for each. Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sence self-incriminatory and unquestionably against interest. [Citations.] McDonald stood to benefit nothing by disclosing his role in the shooting to any of his three friends and he must have been aware of the possibility that disclosure would lead to criminal prosecu-

tion. Indeed, after telling Turner of his involvement, he subsequently urged Turner not to 'mess him up.' Finally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and had been under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury." (410 U.S. 284, 300-301, 35 L. Ed. 2d 297, 311-312, 93 S. Ct. 1038, 1048-9.)

In this case the measures of reliability suggested by the *Chambers* analysis are not present: the purported statement was heard only by a woman with whom defendant then lived and is unsupported by independent evidence. Also, in *Chambers* the third party was available to testify, while here Lopez remained unapprehended during defendant's trial. In our opinion, the trial court's determination that the offered testimony of Mrs. Dawson lacked sufficient threshold reliability to fall within our limited admission-against-penal-interest hearsay exception was correct and such testimony was properly withheld from the jury. That portion of the offer, however, relating to Mrs. Dawson's view of the plated revolver in Lopez's possession the night following the murder, and that he gave it to her to carry in her purse temporarily, is clearly admissible.

Defendant raises numerous issues regarding the State's use of a prior conviction to impeach his credibility on the stand. Their extended discussion is rendered unnecessary, however, by our rule first announced in *People v. Montgomery (1971), 47 Ill. 2d 510.* In examining the effect of *Montgomery* on cases originally commenced before its adoption but retried thereafter, we find no persuasive argument for denying its application to *trials* conducted after March 31, 1971. Unlike certain exclusionary rules pertaining to evidence obtained in violation of rights guaranteed by the constitutions of the United States and Illinois, there can be no true reliance upon the former

rule here by the State or its police agencies. Therefore, we hold that the benefits of the *Montgomery* holding are available to this defendant.

In view of our disposition of this case, it is unnecessary to discuss other asserted errors since they are unlikely to recur in a retrial. Accordingly, the judgment of the circuit court of Cook County is reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. JUSTICE SCHAEFER, dissenting in part:

I am unable to agree with the opinion of the court insofar as it holds that upon the new trial the witness Rosemary Dawson may not testify that on the evening of the shooting Lopez told her that it was he who had shot Wolfman. The opinion holds that while she may testify that Lopez had the silver plated revolver that evening, and that he gave it to her to carry for him, she may not testify that he told her that he fired the fatal shot.

The rule of evidence applied by the majority has been sharply criticized. (See, 5 Wigmore, Evidence (3d ed. 1940) sec. 1477; McCormick, Evidence (Cleary ed. 1972) secs. 278-280; Proposed Federal Rules of Evidence, Rule 804(b)(4) and Committee Note; 39 Fordham L. Rev. 136; 62 Nw. U.L. Rev. 934.) Dissatisfaction with that rule, which admits into evidence a hearsay declaration that is against the declarant's financial interest but excludes one that is against his penal interest, has finally culminated in *Chambers v. Mississippi (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038.* There the exclusion of the testimony of witnesses that a third person had admitted the commission of the crime for which the defendant was being tried was an important factor in the Supreme Court's determination that the defendant had been deprived of due process of law.

Like *Chambers,* the present case is a close one. The first trial of the defendant resulted in a hung jury. The

evidence would not support an inference that Lopez and the defendant had formed an intention to kill Wolfman when they intervened in his street brawl with the customer who had been evicted from his restaurant. The determination as to who had fired the fatal shot was thus more important here than it would be in a case that involved concerted action between two defendants.

The admission of Lopez was made a few hours after the crime was committed. It is unquestionably incriminatory. There is corroboration in the testimony of the witness Young that the gun that he took away from the defendant immediately after the shooting was the black .32-caliber automatic, and in the proffered testimony of the witness Dawson that Lopez had the silver plated revolver and had asked her to carry it in her purse for him, and that when he left her he said, "You won't be seeing me for a while." The decision of the Supreme Court of the United States in *Dutton v. Evans (1970), 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210,* has minimized the significance of the unavilability of Lopez. (See also, Proposed Federal Rules of Evidence, Rule 804.) These circumstances persuade me that the witness Dawson should be permitted to testify at the new trial that Lopez admitted to her that he shot Wolfman.

MR. JUSTICE GOLDENHERSH joins in this dissent.