THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT EUGENE KIRKPATRICK (Impleaded), Defendant-Appellant.

Fourth District   No. 14986

Opinion filed March 26, 1979.

CRAVEN, J., dissenting.

Patricia Crowley, of Champaign, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (John R. DeLaMar and James E. Souk, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE GREEN delivered the opinion of the court:

After trial by jury in the circuit court of Champaign County, defendant Robert Kirkpatrick was convicted of the murders of Douglas Simmons and Mark Harris and sentenced to concurrent terms of imprisonment of 200 to 500 years for each.

On appeal defendant asserts that the trial court erred in (1) permitting trial by a jury selected in a manner making it conviction-prone, (2) permitting, over his objection, a closed hearing on certain pretrial motions, (3) permitting evidence of his participation in another crime to be presented to the jury, (4) erroneously instructing the jury, (5) permitting inflammatory photographs and slides to be seen by the jury, (6) refusing to admit evidence of a statement made by a co-defendant, (7) submitting evidence of his prior convictions to the jury, (8) granting the

State's motion to sever and denying his motion for joinder, (9) refusing to remove a juror for cause, and (10) imposing excessive sentences.

As the sufficiency of the evidence to convict is not in dispute, we summarize the evidence only to the extent necessary to explain the issues.

The bodies of the victims were discovered along a Champaign County road on the morning of Monday, September 26, 1977. Most of the proof of defendant's guilt came from a statement given by him to law enforcement officers, the substance of which is hereafter described. On Saturday, September 24, 1977, Jerry Gleckler and Ted Parsons drove up to defendant's place of work in Danville and showed him some guns which they said they had just "ripped off." They said they were going to saw off a 20-guage shotgun and sell a couple of the guns. That evening the three went to Gleckler's trailer. The shotgun was sawed off with a hacksaw brought by defendant. Parsons and defendant left about 7:30 or 8 p.m. and, because Parsons needed money, tried to find a place to rob. An Arco service station near Danville was selected. Their car was parked near the station and the shotgun was loaded. Defendant put the gun under a coat and walked to the station. When he went into the station building, he decided he could not commit the robbery so he left. Parsons then agreed to do it, saying he would hit the attendant over the head and take the station's money. Defendant watched from the car, started to drive up to the station, heard Parsons shoot the attendant, picked Parsons up, and drove to Champaign.

Defendant and Parsons split the robbery proceeds, stayed overnight Saturday in Champaign, and on Sunday, returned to Danville and went to Gleckler's trailer. The three decided to rob another place but thought it best that it not be near Danville. They decided on a liquor store near Mahomet, northwest of Champaign. They drove to the liquor store but Parsons decided they should use another car for the robbery. Parsons suggested waiting for someone to come out of the liquor store and then abducting them and taking the car. They soon decided that a Plymouth leaving the store with two persons in it was an appropriate car to obtain. They followed the car, forced it to the side of the road, and Parsons jumped out with the shotgun. Defendant was surprised at the manner in which Parsons forced the other car to stop. He heard Parsons yell something, then heard two shotgun blasts. Gleckler got out and defendant heard two more blasts. Gleckler came back, asked for two more shells, and said he wanted to make sure. Defendant handed him the box of shells and turned around. He heard Gleckler shoot again. Gleckler returned to the car with blood on his pants and shirt. Defendant thought that the victims were to be tied with a rope that was in Parsons' car and had not thought that they were to be shot. Defendant was told to drive the

victim's car back to the liquor store and did so but got lost doing it. When the three eventually got back to the liquor store, it was closed and no robbery was attempted.

A man testified to having seen defendant, Gleckler, and Parsons in a restaurant on Sunday night and a person who had been with that man at the restaurant testified to having heard one of the three tell the others, "Don't do anything anybody will remember us by." Other evidence of some corroborative value was also presented by the State.

Defendant testified, on his own behalf, said that he had been drinking on the day in question, and explained his participation as set forth in this paragraph. He was with the other two men in a car outside the liquor store. There he persuaded Parsons not to hold up a person coming out of the store. Parsons had also talked of robbing the store but defendant said it was stupid and that he didn't need the money. Parsons drove after a car leaving the store but there was no conversation as to what they intended to do. Parsons drove in front of the other car, stopped, causing the other car to stop, and ran back to the other car. Gleckler got out with a shotgun and some shots were fired. Gleckler came back for some shells, defendant reached for them but Gleckler got them himself and said something about Parsons being crazy. Defendant got out, went to the back of the car and heard Parsons tell Gleckler to shoot them but Gleckler refused. Parsons told defendant to pick up spent shotgun shells. As he did so, he heard two more shots. Gleckler, rather than defendant, drove the victim's car away from the scene. Defendant did not know that anyone was to be shot. The trio had no particular place in mind to go when they had set forth on Sunday.

The State indicated that it would seek the death penalty and questioned the prospective jurors accordingly. Defendant's contention that the method of jury selection resulting in a conviction-prone jury is based upon the trial court's excusing for cause seven prospective regular jurors and two prospective alternate jurors who stated on *voir dire* that they would under no circumstances vote at sentencing in a manner to authorize a death penalty.

Defendant's theory is an outgrowth of the decision in *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. There the court held that the then-existing Illinois practice of excusing for cause all prospective jurors who admitted opposition to the principle of the death penalty produced a constitutionally impermissible death-penalty-prone jury. However, that court rejected the argument that a jury so screened was necessarily conviction-prone and let the convictions stand while remanding for resentencing. That court concluded that the results of studies presented on the question of whether a death-penalty-prone jury was necessarily conviction-prone were "too tentative and fragmentary" to

establish that theory. 391 U.S. 510, 517, 20 L. Ed. 2d 776, 782, 88 S. Ct. 1770, 1774.

The *Witherspoon* court stated that had the trial court only dismissed prospective jurors who maintained that under no circumstances could they impose a death sentence, the prosecution could argue that the resulting jury was not death-penalty-prone but could not logically do so when all persons having scruples against capital punishment, or opposing in principle, were excluded. In a footnote to this discussion the court foresaw the argument made here. The footnote stated:

"Even so, a defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to *guilt*. If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment. That problem is not presented here, however, and we intimate no view as to its proper resolution." 391 U.S. 510, 520 n. 18, 20 L. Ed. 2d 776, 784 n. 18, 88 S. Ct. 1770, 1776 n. 18.

In the post-*Witherspoon* cases of *People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537, and *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363, the supreme court has rejected the contention that the practice of excusing for cause, jurors opposed to capital punishment imposes upon the defendant an impermissibly conviction-prone jury. The *Wright* opinion described the issue as having been left open by *Witherspoon* and a companion case of *Bumper v. North Carolina* (1968), 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788, but both *Wright* and *Clark* concluded that no new data had been presented to support the theory that a jury selected in a manner so as to exclude those opposed to capital punishment was conviction-prone.

Defendant asserts that additional studies are now available to demonstrate that a jury in a capital case chosen within the guidelines of *Witherspoon*, permitting exclusion of jurors who would never impose the death penalty, is impermissibly conviction-prone. The *Witherspoon* note referring to the possibility that some future defendant might establish that such bias existed did not say that if this happened, the conviction should be set aside. Rather, the note indicated that under those circumstances, a future court would have to balance the State's interest in having a jury capable of imposing capital punishment against the defendant's interest in a completely fair jury to decide upon the question of guilt. The note suggested the possibility of avoiding the problems by having bifurcated

hearings with separate juries passing upon the separate issues of guilt and sentence.

The studies upon which defendant relies are reviewed in White, *The Constitutional Invalidity of Convictions Imposed by Death-Qualified Juries*, 58 Cornell L. Rev. 1176 (1973). The most significant of these is one conducted by Professor G. Jurow in which he attempted to overcome problems of earlier studies by using a sample of subjects more nearly representing a cross-section of prospective jurors. (Jurow, *New Data on the Effect of a "Death-Qualified" Jury on the Guilt Determination Process*, 84 Harv. L. Rev. 567 (1971).) The study indicates that if those persons unwilling to impose a death penalty are eliminated from a jury, the jury would have a very slight bias toward conviction. The Jurow study and others discussed in the White article were all in existence at the time of the *Wright* decision. Whether any of them were presented in that case is not shown by the opinion. In *Clark* a study rejected by the *Witherspoon* court had been presented.

No court of review has, in the past, found to be valid data indicating that a capital jury selected in conformity to *Witherspoon* requirements is conviction-prone. Even if such a determination is made by a court, *Witherspoon* does not mandate a reversal of the conviction. We consider the Jurow study to be the best yet presented but it indicates, at most, only a very slight bias in favor of conviction. It admits that such bias is ameliorated by the exclusion of jurors at the opposite end of the spectrum as to their views on the death penalty. Here, two jurors were excluded when they stated, on *voir dire*, that they would be certain to vote for the death penalty if the defendant were convicted.

■■ Considering the precedent of the prior cases, the Jurow study, and the fact that some highly death-penalty-prone jurors were also excused here, we conclude that the jury selection method used here was not shown to be such as to produce a conviction-prone jury.

On November 30, 1977, six days before defendant's trial was scheduled to begin, the court, over defendant's request that the hearings be open, heard *in camera* pretrial motions for a bill of particulars, to change the place of trial, for additional discovery, for appointment of special counsel, to dismiss and declare the death penalty statute unconstitutional, for lie-detector examination, for individual *voir dire* and sequestration of jurors during *voir dire*, to sequester the jury, for viewing, for funds to hire an investigator, and for funds for expert witnesses. No evidence was introduced and the hearing consisted entirely of the arguments of counsel and statements by the judge. Defense counsel estimated that the proceedings lasted about 1 hour and 45 minutes.

The parties acknowledged that a person charged with a crime is entitled to a public trial by virtue of article I, section 8 of the Illinois

Constitution of 1970 and under the Sixth Amendment to the Constitution of the United States. (See *Sheppard v. Maxwell* (1966), 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507.) They also acknowledge that certain types of matters may be heard *in camera* over defendant's objections. Obviously, as done in *People ex rel. Woodward v. Oliver* (1975), 25 Ill. App. 3d 66, 322 N.E.2d 240, *cert. denied* (1975), 423 U.S. 927, 46 L. Ed. 2d 255, 96 S. Ct. 275, and in *People v. Jackson* (1968), 98 Ill. App. 2d 97, 240 N.E.2d 364, a court may proceed to chambers to hear objections to offered evidence or argument. In *People v. Latimore* (1975), 33 Ill. App. 3d 812, 342 N.E.2d 209, a restriction upon those permitted to be present during the cross-examination of a rape victim was upheld. There, persons having a special interest in the case including news media were not excluded.

Preliminary conferences have traditionally been held not to be a part of the trial and not required to be in open court. (21 Am. Jur. 2d *Criminal Laws* §260 (1965); *State v. Pullen* (Me. 1970), 266 A.2d 222; *Hayes v. United States* (8th Cir. 1961), 296 F.2d 657, *cert. denied* (1962), 369 U.S. 867, 8 L. Ed. 2d 85, 82 S. Ct. 1033; *People v. Teitelbaum* (1958), 163 Cal. App. 2d 184, 329 P.2d 157, *cert. denied* and *appeal dismissed* (1959), 359 U.S. 206, 3 L. Ed. 2d 759, 79 S. Ct. 738.) More recently, in cases where the focus was upon First Amendment rights of the news media and the public, courts have ruled *in camera* hearings on motions to suppress to be improper in *State ex rel. Dayton Newspapers, Inc. v. Phillips* (1976), 46 Ohio 2d 457, 351 N.E.2d 127, and *State v. Allen* (1977), 73 N.J. 132, 373 A.2d 377. A similar ruling was made with reference to a hearing to determine probable cause in *Keene Publishing Corp. v. Keene District Court* (1977), ___ N. H. ___, 380 A.2d 261.

The instant hearing did not involve the hearing of evidence, and did not involve motions to suppress or probable cause determinations. However, it was not merely a side-bar conference to rule on the admissibility of evidence, nor, as in *Hayes*, a conference to determine whether defendant should be represented by counsel. It is also noteworthy that in the later cases where courts have disapproved the closed pretrial hearing, the proceedings were considered to be part of the trial whereas in the earlier cases, the conferences held were considered not to be part of the trial. (See *Hayes; Teitelbaum.*) The present trend is to recognize more and more the desirability of having proceedings in the open and protecting the defendant from the prejudicial effects of pretrial publicity in other ways. A prestigious committee studying the subject has recommended that ABA Standards, Fair Trial and Free Press §3.1 (1966), be amended to provide that pretrial hearings in criminal cases not be closed unless there is a "clear and present danger to a fair trial" arising from the likelihood that prejudicial information will get to prospective jurors and the effect cannot be avoided by such procedures as changes of

venue, continuances, and lesser measures. Legal Advisory Commitee on Fair Trial and Free Press, Draft at 6-7 (August 1, 1977).

■■ No direct precedent holds that the conducting, over defense objections, of *in camera* hearings concerning the type of matter involved here to be reversible error. The trial judge was properly concerned with keeping prejudicial information from prospective jurors. Without attempting to define the types of matter that may be properly held *in camera* over defense objection, we determine that no reversible error or violation of defendant's right to an open trial occurred here.

■■ Defendant asserts that the court erred in permitting the portion of defendant's statement which told of the gasoline station robbery the previous night to go to the jury and in permitting the State to cross-examine defendant about this. Evidence of other crimes committed by a defendant is inadmissible to show a defendant's propensity to commit crime and, because juries may tend to give it weight for that reason, is not only inadmissible but highly prejudicial. (*People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288; *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) However, if it has sufficient probative value towards proving the defendant's intent, motive, or design, it is admissible for those limited purposes. *McDonald*; *People v. Tiffin* (1974), 16 Ill. App. 3d 367, 306 N.E.2d 325; *People v. Woodruff* (1978), 62 Ill. App. 3d 949, 379 N.E.2d 907.

■■ As to all but the felony-murder counts against defendant, the evidence indicated his guilt only by his accountability for the acts of Parsons and Gleckler. The State could establish that accountability by proving that before or during the commission of the murder, with the intent to promote or facilitate it, he aided, abetted or attempted to aid one of them in the commission of the murder. (Ill. Rev. Stat. 1977, ch. 38, par. 5—2(c).) Defendant's statement indicated that at the scene of the murder, Parsons ran out of the car and fired two shotgun blasts. Defendant's knowledge of what Parsons had done would bear on the intent of his subsequent acts. Knowledge that the night before Parsons had shot a robbery victim would tend to indicate to defendant that Parsons had shot one or both of the victims here. When, with this knowledge, defendant, according to his statement, later got out of the car, gave more shells to Gleckler, and picked up spent shells, the inference would arise that he did so with the intent to aid in the murder of the victims. Evidence that defendant continued to consort with Parsons after his experience of the night before would also tend to negate defendant's claim, on cross-examination, that he was motivated by fear in picking up the shells. The trial judge did not abuse his discretion in concluding that the probative value of the evidence for its limited purpose outweighed its prejudicial

effect on defendant. *People v. Olivas* (1976), 41 Ill. App. 3d 146, 354 N.E.2d 424.

The question of defendant's accountability is also the issue in defendant's assertion that the jury was erroneously instructed. Without objection, the jury was given the standard Illinois Pattern Jury Instruction, Criminal, No. 5.03, which states:

> "A person is responsible for the conduct of another person when, either before or during the commission of a crime, and with the intent to promote or facilitate the commission of a crime, he knowingly solicits, aids, abets, agrees or attempts to aid the other person in the planning or commission of the crime."

In addition, over defendant's objection, the jury was given a non-IPI instruction, drawn from language in *People v. Hill* (1968), 39 Ill. 2d 125, 133, 233 N.E.2d 367. The instruction stated as follows:

> "If you find that the defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design, there is an inference that he shared a common purpose and this will allow his conviction as a person responsible for a crime committed by another in furtherance of the venture."

■ Defendant argues that this instruction could confuse the jury into believing that there is a lesser standard for determining defendant's accountability than whether defendant acted with the specific concurrent intent to promote the offense of murder. However, for two reasons, such specific intent is not necessary. The Illinois Supreme Court has firmly adhered to the common-law common-design rule whereby if two or more persons have a common design to commit an unlawful act, any act done in furtherance of the common design is the act of all. (*Hill; People v. Kessler* (1974), 57 Ill. 2d 493, 315 N.E.2d 29; *People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56; *People v. Holmes* (1977), 67 Ill. 2d 236, 367 N.E.2d 663.) Thus, if defendant had a common design with Parsons and Gleckler to rob the liquor store or to rob the victims of their automobile, he would be responsible for the murder committed in furtherance thereof even though he had no specific intent to aid or abet the murder. Every element of this instruction was supported by some evidence. Secondly, defendant was charged with felony murder (Ill. Rev. Stat. 1977, ch. 38, par. 9(a)(3)) as to each victim and could be found guilty of that offense without the aforementioned specific intent as long as he had accountability for robbery of the automobile. The giving of the instruction was not error.

■■ Defendant objected to the introduction into evidence of two pictures of the torn-up faces of the victims and additional close-up photographs of their wounds. As these items were not shown to the jury, defendant was

not prejudiced by their admission. Several black and white photographs of the murder scene and close-ups of the victims' bodies were also admitted over objection and these were shown to the jury. In order to prove defendant's guilt of the murders, the State was required to show the commission of the murders by the principals. Even though the identity of the victims and the cause of death as testified to by a pathologist was not disputed, the State could properly use the photographs to show the degree of force used and the deliberate manner in which the murder was committed. (*People v. Speck* (1968), 41 Ill. 2d 177, 242 N.E.2d 208, *rev'd as to death penalty* (1971), 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279.) The case differs from *People v. Garlick* (1977), 46 Ill. App. 3d 216, 360 N.E.2d 1121, where an accused who had killed his wife admitted doing so but claimed insanity and the gruesome pictures admitted over his objection had no probative value on that issue. Generally the admission and presentation to the jury of photographic evidence is a matter of the trial court's discretion. (*People v. Myers* (1966), 35 Ill. 2d 311, 220 N.E.2d 297, *cert. denied* (1967), 385 U.S. 1019, 17 L. Ed. 2d 557, 87 S. Ct. 752.) That discretion was not abused here.

Defendant asserts error in the court's refusal to admit into evidence a statement given by Gleckler to the police. The offer was made after defendant had called Gleckler and he had exercised his Fifth Amendment privilege and refused to testify. The parties stipulated that Gleckler admitted shooting the victims after they had originally been shot by Parsons. In portions of the statement, Gleckler had stated that he and not defendant drove the victim's car from the scene and that no discussion of shooting the victims occurred prior to the shooting.

Gleckler's statement in its entirety amounted to a confession. Under certain circumstances, a third person's confession is admissible as an exception to the hearsay rule as a statement against penal interest. The supreme court has spoken on this question in *People v. Lettrich* (1952), 413 Ill. 172, 108 N.E.2d 488, and *People v. Craven* (1973), 54 Ill. 2d 419, 299 N.E.2d 1. In *Lettrich* the prosecution's case connecting the accused to the offense consisted entirely of the defendant's repudiated confession allegedly obtained by duress. The statement sought to be admitted into evidence was the confession of another person to having committed the crime. The supreme court held that under the special circumstances of that case, the interests of justice required that that statement should have been admitted. In *Craven*, the court indicated that one of the requirements for the admissibility of such an admission was the availability of the declarant for cross-examination.

In *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, because of a rule of that State that one who calls a witness vouches for his veracity and may not later cross-examine him, the

defendant was prevented at trial from cross-examining a witness who had confessed to the crime for which the defendant was charged and then repudiated that confession. The defendant was also prevented from putting on evidence of three other confessions of the same offense that the same witness was alleged to have made. The court noted that the statements were likely to be reliable because they had been made to close acquaintances of the declarant shortly after the offense and were self-incriminating. The court also noted that the declarant was available for cross-examination by the State. The unfairness of the voucher rule together with the denial of the admission of the statement was deemed to deny defendant of the fair trial guaranteed by the due process clause of the Fourteenth Amendment.

The circumstances of this case differ greatly from *Chambers* and *Lettrich*. There, the statements in question inculpated the declarant and absolved the defendant. Here, Gleckler's statement that he heard nothing of the idea of shooting the victims was favorable to him rather than inculpating and his statement that he, rather than defendant, drove the victim's car did not inculpate him further after he admitted shooting the victims. Neither statement would have absolved the defendant of accountability for the murders. As long as he learned of the intent of Gleckler to shoot the victims before he handed Gleckler the shells, he could have been found guilty on an accountability theory without any previous conversation about shooting the victims having taken place. He also could have been guilty on a common design or felony-murder theory regardless of the conversation in the car. Defendant's guilt is in no way dependent upon his having driven the victim's car. The exercise of the Fifth Amendment privilege by Gleckler made him unavailable for cross-examination by the State. Because of the serious charges against Gleckler, it would be unreasonable to say that he was available for cross-examination because the State could have granted him immunity. (See *People v. Ireland* (1976), 38 Ill. App. 3d 616, 348 N.E.2d 277.) The trial court properly refused full presentation of Gleckler's statement.

■█ The court was not in error in admitting, for impeachment purposes, evidence of defendant's Federal convictions for unlawful possession and making of a firearm and malicious mischief for each of which defendant had been imprisoned in excess of one year. *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, permits the use of convictions for a felony or other crime involving dishonesty if occurring within 10 years and if the trial judge determines that the probative value for impeachment outweighs the prejudice to the defendant. Defendant cites *People v. Wright* (1977), 51 Ill. App. 3d 461, 366 N.E.2d 1058, as authority for the rule that offenses of the nature involved here are devoid of impeaching value and cannot be admitted. In *Wright*, defendant was impeached by

proof of an aggravated battery conviction. The writer of the opinion cited the use of the evidence as a ground for reversal on the theory that such offenses had no probative value to impeach. A special concurrence disagreed with this ground for reversal but voted to reverse because the trial judge had not performed the test, required by *Montgomery*, of balancing the probative value of that conviction for impeachment against the prejudice to the defendant of admitting the evidence for that limited .purpose. The theory of the concurrence was that any felony conviction could be considered to relate to the honesty and veracity of the defendant and could be considered in performing the balancing test. The dissent agreed. (See our subsequent opinion in *People v. Guthrie* (1978), 60 Ill. App. 3d 293, 376 N.E.2d 425.) Here, the trial judge performed the balancing test and did not abuse his discretion in admitting the evidence.

The court also acted within its discretion in severing the trials of the three defendants and in refusing defendant's request for joinder. Defendant concedes that his theory of defense was shown by pretrial statements to be inconsistent with that of Parsons but states that such was consistent with that of Gleckler. No case has been called to our attention indicating that a defendant in a criminal case was prejudiced by severance and no showing was made that such was true here. In the absence of a showing of prejudice, rulings upon severance and joinder are largely a matter of discretion with the trial court. *People v. Appold* (1976), 39 Ill. App. 3d 814, 350 N.E.2d 511.

■■ Finally, the court also did not abuse its discretion in not excusing a venireman who, on *voir dire*, stated that he was a friend of a grandfather of one of the victims and saw the grandfather about once a year, but that the relationship would not influence his verdict. The venireman also stated that he was hard of hearing and asked the court to repeat questions twice. The judge told him to hold up his hand if he could not hear testimony and the record does not indicate that he had further trouble. Although a juror's opinion of his state of mind is not conclusive (*People v. Cole* (1973), 54 Ill. 2d 401, 298 N.E.2d 705), the record clearly shows that the relationship between the juror and the victim was remote.

■■ Defendant had a prior record of Federal offenses as indicated in the discussion of impeaching evidence. He had also been convicted of misdemeanor theft once and forgery twice. The evidence indicated that the defendant's role in the instant murder was passive but he had continued to engage in criminal activity with Parsons after Parsons had shot the service station operator the night before. This plus defendant's more serious past criminal record distinguishes this case from *People v. Moon* (1976), 38 Ill. App. 3d 854, 350 N.E.2d 179, and *People v. Hill* (1972), 6 Ill. App. 3d 746, 286 N.E.2d 764, where the court on appeal reduced murder sentences for defendants whose participation had also

been passive. Moreover, regardless of the length of the minimum sentence, defendant will be eligible for parole in 20 years less time for good behavior. (Ill. Rev. Stat. 1975, ch. 38, par. 1003—3—3(a)(3).) Any minimum sentence beyond 20 years serves only as an indication to parole authorities of the severity with which the trial judge views the offense and the offender. Even if the maximum sentence were reduced to less than one-fifth its present length, defendant could not complete it during his lifetime. We do not deem defendant to be entitled to a reduction in sentence that would be of significance to him and accordingly refuse to make any reduction.

The convictions and sentences are affirmed for the reasons stated.

Affirmed.

TRAPP, J., concurs.

Mr. JUSTICE CRAVEN, dissenting:

In *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, the Supreme Court clearly invited reexamination of the constitutional issue then left unresolved. Mr. Justice Stewart, speaking for the majority, said that the data then available was "too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared to announce a *per se* constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was." 391 U.S. 510, 517-18, 20 L. Ed. 2d 776, 782, 88 S. Ct. 1770, 1774-75.

Since the opinion in *Witherspoon*, studies have been made, and the results are now available. Those studies clearly indicate that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury and one prone to convict. Those studies are analyzed in depth in White, *The Constitutional Invalidity of Convictions Imposed by Death-Qualified Juries*, 58 Cornell L. Rev. 1176 (1973). I need not here repeat the analysis of the studies.

It is inappropriate that we entrust the determination of whether a man is innocent or guilty to a tribunal organized to convict. (*Fay v. New York* (1947), 332 U.S. 261, 91 L. Ed. 2043, 67 S. Ct. 1613.) The studies now available tell us that a jury chosen within the guidelines of *Witherspoon* is not a representative cross-section of the community and is prone to

180

convict. The majority opinion, with commendable candor, concedes that the Jurow study (84 Harv. L. Rev. 567 (1971)) is the best presented and that it indicates at most "only a very slight bias toward conviction." I would think that it is inappropriate to entrust the determination of guilt to a tribunal that is *slightly biased in favor of conviction.*

We have worked long to establish a system of jurisprudence based upon fairness and an absence of bias. We know by data now available that a jury selected as this one was is not in keeping with the constitutional requirement. We offend our heritage and our tradition if we do not correct the error.