Commonwealth *v.* Swint, Appellant.

Argued January 13, 1972. Before JONES, C. J., EA-GEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Henry T. McCrary, Jr.,* with him *Ronald J. Brockington,* for appellant.

*Milton M. Stein,* Assistant District Attorney, with him *Stephen J. Margolin,* Assistant District Attorney, *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, November 17, 1972:

The appellant, Nathaniel Swint, was indicted for murder in connection with the death of James Battles in Philadelphia, and following a jury trial was convicted of murder in the second degree. Post-trial motions were denied and a prison sentence of 8 to 20 years was imposed. This appeal followed.

From the testimony of eyewitnesses who testified at trial, the jury could find that on the evening of July 11, 1968, Swint and several other young men suddenly

attacked Battles, Nathaniel Headon, Horace Wallace and Louis Hopewell while they were in front of a house in the 2200 block of Annin Street waiting for a friend who was visiting inside; that in the altercation, Swint stabbed Headon in the back of the shoulder with a knife and also stabbed Battles in the chest causing injury which resulted in Battles' death about noon the following day.

Swint was subsequently taken into police custody, and, after twice orally admitting the stabbing, made a detailed statement which was recorded on a typewriter. A pretrial motion to suppress evidence of these admissions and the statement was denied and evidentiary use thereof was permitted at trial over objection. These rulings are the principal assignment of error raised by this appeal.

While there were some conflicts in the testimony before the trial court as to the circumstances surrounding the challenged admissions and the statement, these conflicts were resolved against Swint by the hearing judge. Hence, on review our consideration is limited to the evidence of the prosecution witnesses and so much of the evidence offered by Swint as, fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 239 A. 2d 426 (1968). So read, the record establishes the following facts.

Three investigating police officers, upon being informed Swint was involved in the stabbing, proceeded to his residence without a warrant. Arriving about 2:30 a.m., on July 12, 1968, the officers identified themselves to Swint's mother and told her Swint had been involved in the stabbing of a boy who was in critical condition in the Graduate Hospital and who might die. Swint was aroused by his mother, dressed himself, came downstairs and was told by the officers, "a boy had

been stabbed, and he was going to be questioned about that."

Swint was then taken in a police vehicle to a police office at 24th and Wolf Streets, arriving about 2:50 a.m. Immediately, he was read the constitutional rights mandated by *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966), and indicated by affirmative responses that he understood. Then, without hesitation, Swint told the questioning officer, he stabbed a boy and he had been hit with a brick in the face; that he received treatment at the Philadelphia General Hospital including three injections of penicillin and "something for lockjaw and pain killer". Swint appeared composed and alert and did not indicate his wounds bothered him at that time, although he was wearing a bandage partially covering the left side of the head.

At the conclusion of the above described questioning, which consumed, at most, a total of fifteen minutes, the police officer involved phoned the Headquarters of the Police Homicide Division and, upon reporting what he had learned, was directed to arrange Swint's transfer to the Police Homicide Division Headquarters at 8th and Race Streets. This order was then relayed to the officer at the desk, and the transfer was effected about 4:30 a.m. In the meantime, Swint was not questioned further.

Beginning at 5 a.m., Swint was questioned by a Detective Melfi for fifteen minutes. Swint readily gave Melfi "a synopsis" of the stabbing, whereupon Melfi left Swint alone for about thirty minutes and during part of this period talked with Swint's mother in an adjoining room. Then accompanied by the mother, Melfi rejoined Swint and again advised him of his "Miranda" rights. In answer to questions posed by Melfi in the presence of his mother, Swint detailed his version of the stabbing occurrence. The questions and answers were recorded on a typewriter by Melfi. When

the statement was completed, consisting of six type-written pages, it was read to Swint and he signed each page. The mother signed it as a witness. The statement in most part corroborated the testimony given by the eyewitnesses at trial, as before related.

It is maintained the Commonwealth failed to meet its burden of proving Swint knowingly and intelligently waived his rights under the Fifth Amendment before incriminating himself, hence, evidentiary use at trial of his incriminations violated due process. It is not contended the admissions and the statement were secured through coercive tactics.

At the time of his arrest, Swint was two months short of attaining his 18th birthday and had progressed to the 10th grade in school. Neither side submitted evidence of Swint's intelligence quotient, but a reading of his testimony given both at the suppression hearing and at trial manifests he was at least of normal intelligence.

The main thrust of the attack on the admissibility of the challenged evidence centers around Swint's physical condition at the time it was secured. Hospital records introduced at trial established Swint was treated on July 11, 1969, about 10 p.m. for "two superficial lacerations" of the left temple area of the scalp, each "twelve millimeters in length" which required some suturing to close. He was also given a tetanus shot. (This conflicts with Swint's claim he was also given "three needles" of penicillin.) It is urged that the wound and the attending side-effects of the medicines administered rendered him incapable of exercising free volition and making rational choices. This conclusion does not follow, as a matter of law, on the present record.

As noted before, there was substantive testimony that at the time of the questioning, Swint did not complain of pain, and appeared composed and alert. His

wounds were not of a serious nature. We cannot say that, under the circumstances, the trial court erred, as a matter of law, in concluding Swint's wounds did not prevent him from exercising free volition and making a rational choice. See and cf. *United States ex rel. Cronan v. Mancusi*, 444 F. 2d 51 (2d Cir. 1971); *United States ex rel. Russo v. State of New Jersey*, 438 F. 2d 1343 (3d Cir. 1971). The issue was purely factual and the credibility of the witnesses was for the fact finder.

It is also argued Swint did not knowingly and intelligently waive his right against self-incrimination because he was never warned of the possibility he would be charged with murder. While the police did not delineate with exact precision the crime for which Swint was eventually tried, the circumstances at the time did not permit such clarity. At the time of all of the questioning, Battles was still alive, albeit in critical condition. The fact that Swint was told he was being interrogated concerning the stabbing conveyed enough information about the nature of the crime to aid in making a waiver with a full understanding.

It is next argued the warnings given Swint of his constitutional rights before the police questioning were not adequate to effect a valid waiver; more specifically it is claimed Swint was not clearly apprised of his right to the assistance of free counsel during the questioning. The particular portion of the warning complained of was as follows: "You have a right to talk to a lawyer of your own choice before we ask you any questions and also to have a lawyer here with you while we ask questions. If you cannot afford to hire a lawyer and you want one, we will see that you have a lawyer provided to you before we ask you any questions."

In *Miranda v. Arizona*, supra, the Court ruled that before one accused of crime is subjected to police questioning ". . . it is necessary to warn [the accused]

not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him." 384 U.S. at 473. It is urged this requirement was not fulfilled because the warning given instantly failed to specifically inform Swint, counsel would be provided "free of charge". We do not agree. Our views as to this are fully explained in *Commonwealth v. Ponton,* 450 Pa. 40, 299 A. 2d 634 (1972), and need not be repeated here.

Finally, it is maintained the evidence of the oral admission and subsequent recorded statement made in the presence of Detective Melfi should have been suppressed, because before any questioning by Melfi commenced "Miranda" warnings were not given. Since warnings were given in compliance with *Miranda* just two hours earlier, the absence of such warnings prior to the initial period of questioning by Melfi, did not render this particular evidence inadmissible. What we said in *Commonwealth v. Abrams,* 443 Pa. 295, 299, 278 A. 2d 902 (1971), in discussing this identical contention is particularly appropriate: "We have not held that the Miranda warnings must be given immediately prior to the commencement of every interrogation session nor do we believe that such a rule is necessary." As was said in *People v. Hill,* 39 Ill. 2d 125, 132, 233 N.E. 2d 367, 371 (1968) : "To adopt an automatic second warning system would be to add a perfunctory ritual to police procedures rather than providing the meaningful set of procedural safeguards, envisioned by Miranda." The instant warnings were given as they must be "at the outset of the interrogation process." 384 U.S. at 445, 86 S. Ct. at 1612. Any claim that these warnings had somehow gone stale in two hours time is simply devoid of merit.

The final assignment of error contends the trial court committed prejudicial error in its charge "in

failing to instruct the jury that, in determining the voluntariness of the confession, they must first determine whether within a period of ten minutes (referring to the first period of police questioning) a seventeen-year-old boy suffering from a trauma of the head could intelligently and knowingly waive his rights to a lawyer free of charge."

Only a general exception to the charge was entered and no request for any instruction, as above described, was made. More importantly, a reading of the charge in its entirety manifests the basic issues were defined clearly, fairly and correctly with one exception, and the one inadvertence was favorable to Swint. (The court instructed the jury the burden of establishing the voluntariness of Swint's incriminations was upon the Commonwealth beyond a reasonable doubt.)

Judgment affirmed.

Mr. Justice Nix notes a dissent.

———

DISSENTING OPINION BY MR. JUSTICE O'BRIEN:

I dissent from the opinion of the majority because I do not believe that the *Miranda* warnings given were adequate in that it was not made clear to appellant that counsel would be provided for him free of charge if he were indigent. The majority indicates that this Court's views on that subject are fully explained in *Commonwealth v. Ponton*, 450 Pa. 40, 299 A. 2d 634 (1972), and the majority, therefore, does not discuss the issue further. My views are also fully explained in my dissenting opinion in *Ponton* and I dissent for the reasons stated in that dissenting opinion.

Mr. Justice ROBERTS joins in this dissent.