**Commonwealth v. Davenport**

*Frank DeSimone*, Asst. Dist. Attorney, for Commonwealth.

*Robert P. Paskings*, for defendant.

SAVITT, J., May 30, 1974.—Samuel Davenport was tried by this court and a jury which returned a verdict of guilty of murder in the second degree on February 25, 1974. Pretrial motions to suppress defendant's statements and certain physical evidence were denied by the Hon. Maurice W. Sporkin after hearing on August 6, 1973. Defendant raises three issues in support of his motions for a new trial and in arrest of judgment.

## I. UNNECESSARY DELAY BETWEEN ARREST AND ARRAIGNMENT

Defendant was arrested on April 3, 1973 at approximately 1:50 a.m. on the highway several blocks from where the homicide occurred.[1] He was transported

---

[1] The facts are clear that the arresting officers acted with probable cause and this issue was not raised by defendant.

immediately to Hahnemann Hospital where the victim though fatally wounded still lingered.

At 2:15 a.m., defendant arrived at Central Detective Headquarters where he was placed in a small detention room until 3:08 a.m. at which time he was given his Miranda warnings and read his rights concerning a stand-up from the standard police form. At approximately 3:22 a.m. defendant signed the stand-up waiver.

Defendant remained in the detention room until 5 a.m. while detectives prepared for the stand-up which occurred between 5 a.m. and 6 a.m.

Immediately following the stand-up defendant was questioned by Detective Robert Kuhlmeier who informed defendant he had been identified at the line-up. Detective Kuhlmeier talked to the defendant until approximately 9:20 a.m. concerning the stabbing, during which time defendant admitted his presence in the building where the stabbing occurred but denied his participation. Between 9:20 a.m. and 9:55 a.m. there was a break in the conversation for defendant to eat and use the bathroom.

At 9:55 a.m. defendant asked Detective Kuhlmeier if the victim was still alive and after the detective indicated affirmatively defendant made an oral admission.[2] From 9:55 a.m. until 11:30 a.m. Detective Kuhlmeier took an informal statement from defendant which defendant signed.

Subsequently, defendant was given his Miranda warnings a second time and a formal statement was concluded at 2:40 p.m. after which defendant was transferred to the Ninth District for slating. This

---

[2] Throughout the conversation defendant had been asking if the victim was still alive. Actually, he survived for 10 days in the Intensive Care Unit of Hahnemann Hospital.

second formal statement was not introduced into evidence at defendant's trial.

During the period of questioning, defendant appeared alert, he was responsive and was not under the influence of alcohol or drugs. Defendant was never struck or threatened nor were any promises made to him. He made no complaints, never requested a lawyer and indicated a willingness to talk.

It is defendant's contention that his incriminating statement was obtained as a result of an unnecessary delay between arrest and arraignment in violation of Pennsylvania Rule of Criminal Procedure 130,[3] which provides as follows:

"When a defendant has been arrested without a warrant in a court case, he shall be taken without unnecessary delay before the proper issuing authority where a complaint shall be filed against him and he shall be given an immediate preliminary arraignment."[4]

Beginning with Commonwealth v. Futch, 447 Pa. 389, 290 A. 2d 417 (1972), the Pennsylvania courts gave new meaning and interpretation to the term "unnecessary delay" and new consequences resulting from a failure to abide by Rule 130. In Futch, supra, the Supreme Court defined what was permissible delay:

" 'Necessary delay can reasonably relate to time to administratively process an accused with booking, fingerprinting and other steps and sometimes even

---

[3] Formerly Rule 118 and 118(a).

[4] This court recently considered what constitutes "unnecessary delay" in Commonwealth v. Leuzzi, 14 D. & C. 2d 68, decided April 18, 1974. Although the court arrives at a different result in this case, it is consistent with Commonwealth v. Leuzzi and much of the case law cited and reasoning applied in that case is repeated here.

to make [some] limited preliminary investigation into his connection with the crime for which he was arrested, especially when it is directed to possible exculpation of the one arrested.' "

The court then turned toward the problem of what would be the consequence of a violation of Rule 130. The court, exercising its supervisory powers, adopted the so-called McNabb-Mallory Rule[5] used by the Federal courts. This rule precludes the use of any evidence obtained during an unnecessary delay if that unnecessary delay contributed to the securing of the evidence. The court held that all evidence obtained by an unnecessary delay must be excluded except that which has no reasonable relationship to the delay whatsoever: Commonwealth v. Futch, supra.

In Commonwealth v. Tingle, 451 Pa. 241, 301 A. 2d 701 (1973), the Supreme Court reaffirmed the Futch decision. They viewed Rule 130 in conjunction with Rule 140[6] pertaining to a defendant's right to know the charges against him, right to secure counsel, right to have a preliminary hearing and the right to make bail.

In Commonwealth v. Dutton, 453 Pa. 547, 307 A. 2d 238 (1973), the Supreme Court, in an attempt to further clarify which delays are necessary, limited necessary delays to those for administrative processing and the unavailability of a magistrate only.

Finally in Commonwealth v. Dixon, 454 Pa. 444, 311 A. 2d 615 (1973), the Supreme Court specifically limited the only permissible delay as that which is reasonably required for the administrative processing of the accused citizen. The court held that delay beyond that is unreasonable and constitutes a denial

[5] Mallory v. U. S., 354 U. S. 449 (1957); McNabb v. U. S., 318 U. S. 332 (1943).

[6] Formerly Rule 119.

of a citizen's right to know the nature of the charges against him and to receive an immediate and reasonable opportunity to regain his freedom by the posting of bail.

Recently, the Supreme Court in Commonwealth v. Williams, 455 Pa. 569, 319 A. 2d 419 (1974), decided March 25, 1974, left no doubt that a pre-arraignment delay is unnecessary unless required to administratively process an accused. The court stated:

"It must be emphasized that pre-arraignment delay will *always* be unnecessary unless justified by administrative processing—fingerprinting, photographing, and the like." (Italics supplied.)

The court further expressly held that the delay is unnecessary when it is solely to further investigate the case and obtain more incriminating evidence against defendant.

This court as recently as April 18, 1974, was called upon to rule according to the Supreme Court's decisions regarding the delay between arrest and arraignment. In that decision, Commonwealth v. Leuzzi, 14 D. & C. 2d 68, we held that further investigation of the circumstances of a crime, in order to corroborate an exculpatory statement, is not an administrative delay and a subsequent incriminating statement obtained as a result of that investigation must be suppressed.

The Supreme Court's decisions requiring strict enforcement of Rule 130 have unmistakably added a new dimension to the question of the admissibility of statements made by defendants while in custody. The legal issue presented is not whether the admission was voluntary in the traditional sense but whether the admission was obtained during and as a result of an unnecessary delay between arrest and arraignment. It is an "unnecessary" delay which is the subject of these decisions and not an unreasonable delay. A fair

reading of these cases makes it clear that the length of time that elapses between the original arrest and the incriminating statement is not controlling where (1) the delay is unnecessary, (2) evidence that is prejudicial is obtained, and (3) the incriminating evidence is reasonably related to the delay. Thus, the incriminating statement, when it meets the three-part test, is inadmissible even though the elapsed time may be brief.

Conversely, an admissible statement may be obtained during a more substantial delay, provided the delay was necessitated by administrative procedures.

It may be true that the strict enforcement of Rule 130 as enunciated by the Supreme Court renders obsolete many customary police practices and may initially result in depriving the Commonwealth of essential evidence in some instances.

This court and surely the Supreme Court are not unmindful nor unconcerned with the tremendous problems which face the police, particularly in a large urban area. This concern, however, cannot justify permitting an accused to be deprived of the very fundamental right to be arraigned without unreasonable delay after his arrest.

It should be noted that nothing in Rule 130 prohibits the police from questioning suspects, after proper warnings, during an on-going investigation prior to the suspect's arrest.

A necessary delay in the considered opinion of this court would also include the interrogation of an accused, after the proper warnings are given (1) promptly after his arrest, or (2) promptly after he has voluntarily submitted to a recognized police procedure requiring his physical presence, or (3) while actually undergoing administrative processing.

In Commonwealth v. Leuzzi, supra, this court concluded that the statement was the product of an unnecessary delay and ordered it suppressed. In Leuzzi, defendant was held in custody for one hour and forty-five minutes after his initial interview was concluded solely to investigate the veracity of his exculpatory statement, thereby inducing a subsequent incriminating statement.

In the instant case, defendant was initially interviewed at 6 a.m. promptly after he had voluntarily submitted to a stand-up, a recognized police procedure requiring defendant's physical presence. The incriminating statement was obtained less than four hours after the interview was begun. During the course of the interview, only Detective Kuhlmeier questioned defendant unaided by other detectives. The interview was continuous and not oppressively long. Defendant's personal needs were attended and he was fed. Throughout the interview, defendant admitted his presence at the scene and his willingness to talk. Detective Kuhlmeier was well within his authority to pursue this line of questioning for a reasonable period of time and within a reasonable manner.

Applying the rationale of the Pennsylvania Supreme Court in Futch, Tingle, Dutton, Dixon and Williams, it is this court's considered opinion that no "unnecessary delay" occurred in the instant case.

Perhaps a different conclusion would have been reached had the police used the time defendant was being held solely to further investigate the case or verify a previous exculpatory statement. Likewise, had defendant been subject to several separate interrogations by various interviewers after a firm denial or refusal to talk, the result may have been different. The facts and circumstances of each case must always be scrutinized carefully to determine whether there was an "unnecessary delay" as defined by our Supreme

Court. In this case, the court concludes there was none.

## II. NECESSITY OF REPEATING MIRANDA WARNINGS IMMEDIATELY BEFORE THE INTERROGATION

After defendant was transported to the Central Detective Headquarters, he was placed in a room alone until 3:08 a.m., at which time he was given his Miranda warnings by Detective Earl Asimos. At 6 a.m., upon returning from the line-up, defendant was questioned by Detective Kuhlmeier who did not repeat the Miranda warnings.

Defendant contends that the warnings he received at 3:08 a.m. had grown stale, and in the absence of new warnings, his confession was involuntary.

There is no prophylactic rule that a suspect must be rewarned of his constitutional rights each time custodial interrogation occurs. Instead, the totality of the circumstances in each case must be reviewed to determine whether such repeated warnings are necessary: Commonwealth v. Ferguson, 444 Pa. 478, 282 A.2d 378 (1971); Commonwealth v. Abrams, 443 Pa. 295, 278 A.2d 902 (1971); Commonwealth v. Riggins, 451 Pa. 519, 304 A.2d 473 (1973).

Pertinent to such inquiry, the following factors must be taken into account: (1) the length of time between the warnings and the challenged interrogation; (2) whether the warnings were given at the same place the interrogation was held; (3) whether the officer who gave the warnings conducted the interrogation and (4) whether the statement given is materially different from the one given after the warnings: Commonwealth v. Riggins, supra; Commonwealth v. Bennett, 445 Pa. 8, 282 A.2d 276 (1971).

Defendant points to Commonwealth v. Swint, 450 Pa. 54, 296 A.2d 777 (1972), in support of his position that the warnings were stale. In that case, warnings were held valid although there was a two-hour time lapse and the warnings were given at a different place. The Supreme Court, while setting no specific time limit, has permitted interrogations to commence five hours after the Miranda warnings were given without the need for a rewarning: Commonwealth v. Bennett, supra. In the only case where warnings were held to be stale, defendant was 17 years old, had been warned 17 hours earlier while on the way to the police station, had denied complicity in the initial interrogation after the warnings, had been through two line-ups, one polygraph examination and seven interrogations before he changed his statement: Commonwealth v. Riggins, supra.

Applying the Supreme Court mandated rule of the totality of the circumstances to the present case, defendant's argument must be rejected. The length of time elapsed between Miranda warnings and the incriminating interrogation was about three hours. While it is true a different detective interrogated defendant from the one who read him his warnings, the warnings and interrogation took place in the same room. The interrogation which produced the confession was the first interrogation after the warnings. There was no previous statement from which defendant could have materially differentiated. Under these circumstances, it cannot be concluded that the failure to rewarn defendant of his Miranda rights fatally tainted his confession.

## III. SEIZURE WITHOUT A WARRANT

At the time of his arrest, defendant was wearing a light jacket. The arresting officers noticed what ap-

peared to be blood stains on the inside of the jacket which was being worn inside out. When defendant arrived at Central Detective Headquarters approximately 2:15 a.m., 25 minutes later his jacket was removed from him and hung on a coat rack.

Detective Michael Lacey then requested a search warrant for the jacket and other items of clothing for the purpose of analyzing the blood stains. The warrant (#137914) was issued and the jacket was seized from the coat rack pursuant to the warrant at 9:30 a.m.

Defendant argues that the jacket was effectively seized when it was taken from him at 2:15 a.m. and that the seizure was not incident to the arrest.

The facts of this case do not support defendant's contention that the jacket was seized at 2:15 a.m. The police at no time made any attempt to seize the jacket for analysis until the search warrant was properly issued and executed. The natural act of removing one's jacket when entering a building should not be interpreted as a seizure because the building is police headquarters.

Seizures executed pursuant to a valid search warrant are admissible as evidence if the warrant was issued with probable cause. Probable cause exists for a search warrant where the facts within affiant's knowledge are from reasonably trustworthy information and are sufficient to warrant a man of reasonable caution to believe that a search should be conducted: Commonwealth v. Thomas, 448 Pa. 42, 292 A.2d 352 (1972). A reading of the warrant leaves little doubt that probable cause existed for its issuance.[7]

---

[7] Statement of Probable Cause, Warrant No. 137914 reads:

"On April 3, 1973, about 1:40 A.M. Richard Kennedy, 60, white male, residence 1521 South Hollywood Street was stabbed multiple times inside Triangle Publications, 431 North Broad Street, where he is employed as a guard by a negro male. About 2:10 A.M. April

Assuming there was a seizure before the search warrant was issued, the seizure occurred at the time of arrest, when the officers noticed the blood stains in plain view. In that case, the seizure would be incident to a lawful arrest and no warrant would be necessary.

It has long been settled that objects falling in plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence: Harris v. U. S., 390 U. S. 234, 88 S. Ct. 992, 19 L. Ed. 2d 1067 (1968); Commonwealth v. Davenport, 453 Pa. 235, 308 A. 2d 85 (1973). Where the police inadvertently come upon a piece of evidence, it would often be a needless inconvenience and sometimes dangerous to require them to ignore it until they have obtained a warrant particularly describing it: Coolidge v. New Hampshire, 403 U. S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971).

Although defendant was permitted to continue to wear his jacket after the stains were noticed, this would not vitiate the fact that a plain view seizure had already been accomplished.

For the reasons stated above, motions for arrest of judgment or new trial are denied.

-----

3, 1973, policeman Robert Carr 9505 and Robert Covington, #1643, 6th District, assigned to radio patrol car number 618, received flash information over police radio describing the male wanted for the stabbing as a negro male about 25 years, five feet five inches, 130 pounds, wearing a yellow jacket and dark pants. They observed the above named Samuel Davenport walking on highway Broad and Brown Streets, and noticed that he fit the description. They pulled over and stopped the subject, and at this time noted he had his jacket on inside out and was trying to pull up the zipper. As they approached closer to frisk him for weapons they observed what appeared to be blood on the jacket. They took the subject into custody. The stains on the jacket appear to be blood, and there are also stains on the subject's shoes and pants. Would like to have the same analyzed by Chemical Laboratory for identification of stains."